Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, FRANCESKA HERRERA

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FRANCESKA HERRERA, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br>v.<br><br>CITIGROUP INC., a Delaware corporation,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

Plaintiff FRANCESKA HERRERA ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant CITIGROUP INC., a Delaware corporation ("Defendant" or "Citibank"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.citi.com (the "Website"), a website that Defendant provides for public access and use.

2. During her use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting Third Parties to intercept the contents of her communications and reveal her personal searches and content interests.

3. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what she was browsing, the page titles identifying the subject matter she was reading, and the referring URLs reflecting the pages from which she had navigated, by causing each such communication to be duplicated by code Defendant embedded on the Website and routed to the Third Parties on the same page-load event, as the communication was being made.

4. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing and the page titles reflecting what users are reading, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including cross-session behavioral profiling, audience measurement, audience segmentation, and the monetization of users' browsing activity through targeted advertising.

5. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). The Website has been configured in this manner from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II. GENERAL ALLEGATIONS

6. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, page titles identifying what the user is reading, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

8. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Comscore Tracker
- The Google Tracker

9. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators are referred to collectively as the "Third Parties."

10. The Trackers are operated by distinct third parties, namely Comscore, Inc. (as to the Comscore tracker, also branded as ScorecardResearch) and Google LLC (as to the Google tracker) (collectively, the "Third Parties"). Defendant knowingly embeds and

deploys the Trackers on the Website to facilitate the Third Parties' interception of the contents of users' electronic communications, and configures them to execute automatically within users' browsers upon page load and navigation. As a result, Defendant causes the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

11. Defendant configured the Website so that the same content is transmitted twice. When Plaintiff's browser requested a page, code that Defendant embedded on the Website copied the contents of that communication, including the full page URL, the title of the page, and the URL of the page navigated from, and caused Plaintiff's browser to transmit the copy to servers the Third Parties control, on the same page-load event and as part of the same browser transaction by which Plaintiff requested and received the page. No user interaction was required, and the duplicate transmissions were not visible to Plaintiff.

12. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

13. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

14. Plaintiff FRANCESKA HERRERA is a California citizen residing in Los

Angeles County, California, and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on July 22, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

15. Defendant CITIGROUP INC. is a Delaware corporation that owns, operates, and controls the Website, through which Defendant markets and provides information about credit cards, banking products, lending products, and related consumer financial services, and publishes consumer-facing editorial and educational content concerning credit and debt.

16. Defendant conducts banking and consumer financial services business nationwide and serves consumers in California and throughout the United States, including through the Website.

## IV. JURISDICTION AND VENUE

17. Defendant is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of jurisdiction on any basis not inconsistent with the United States or California Constitutions.

18. Citibank has cultivated California as a significant market for its consumer financial products. Citibank maintains branches, offices, and substantial and continuous commercial operations in California, including in this District, and solicits California residents for credit cards and other consumer financial products. The Website serves as a primary digital channel through which Citibank markets those products to California residents and delivers consumer-facing content concerning credit and debt to them. Citibank purposefully directed the Website, and the tracking technologies it embedded in the Website, at California residents, and it did so in a manner that was neither random, isolated, nor fortuitous.

19. Plaintiff's claims arise out of and relate to that forum-related conduct. Plaintiff accessed the Website from California. The interception of the contents of her

communications occurred on her device in California, by Trackers Citibank deliberately embedded on its Website, while Plaintiff was reading content Citibank directed to California consumers.

20. Exercising specific personal jurisdiction over Citibank in this District comports with constitutional notions of fair play and substantial justice. Citibank is an established financial institution with offices and operations in California and substantial commercial activity directed at California residents, and Citibank cannot reasonably claim surprise or undue burden from being haled into a California federal court to answer claims arising from interception of California residents' communications via Trackers Citibank itself embedded on its Website.

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

22. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

23. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendant's state of citizenship, satisfying CAFA's minimal-diversity requirement.

24. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website

from her Los Angeles County residence; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California consumers in this District.

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

25. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

26. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications, and consent under CIPA must be obtained before the interception occurs.

27. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein, which implicate traditional interests in personal privacy, constitute concrete injuries sufficient to establish Article III standing.

28. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

### 2. The Federal Wiretap Act

29. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control

and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

30. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

31. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

32. Plaintiff personally used the Website during the class period, including on July 22, 2026, and preserved an HTTP archive file, commonly known as a HAR file, of one of her own browsing sessions. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses received. Plaintiff's HAR file accordingly records the requests that Plaintiff's browser transmitted to the Third Parties during that session, including the named parameters carrying the contents of her communications with the Website and the persistent

identifiers her browser transmitted together with those contents. The figures reproduced below are from an independent technical investigation counsel commissioned, which replicated the URLs and user flows recorded in Plaintiff's HAR file, and they are included as corroboration of the tracking transmissions documented in Plaintiff's own HAR file.

33. During her use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the contents of her communications:

- https://www.citi.com/credit-cards/knowledge-center/search-results?q=debt&pager=1;
- https://www.citi.com/credit-cards/debt-management/credit-card-debt-relief-what-are-my-options; and
- https://www.citi.com/credit-cards/debt-management/credit-card-debt-forgiveness.

34. The first of those pages is the Website's own search results page, and the URL states the term Plaintiff searched for on the Website, "debt," as a named query-string value. The second and third are pages within the Website's debt-management section, and each URL states its own subject matter in ordinary words.

35. During each of the visits identified above, the Trackers described below operated on the Website and intercepted the substantive contents of Plaintiff's communications with the Website. What the Trackers received was not limited to an address. In a single outbound request, each Tracker received the title of the page Plaintiff was reading, spelled out in ordinary English as its own named payload parameter, together with the full URL of that page and, as to Comscore, the URL of the page from which Plaintiff had navigated. Each of those fields communicates the substance, purport, or meaning of what Plaintiff was reading or searching for, and is therefore content of Plaintiff's electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8).

**1. The Comscore Tracker**

36. Defendant embedded and deployed a Comscore tracking tag on the Website, operated by Comscore, Inc., also branded as ScorecardResearch. The tag is not a resource Plaintiff requested and is not necessary to render any of the Website's content. It runs on the Website because Defendant put it there and configured it to run, and it carries Defendant's own Comscore Publisher ID and Defendant's own Comscore site key, so that what it transmits is credited to Defendant's account with Comscore.

37. The tag operates as follows. When Plaintiff directed her browser to one of the pages identified above, her browser began loading that page from servers operating under Defendant's control. As part of that same page load, and without any further request or action by Plaintiff, the browser executed the Comscore tag code. That code read, from the browser's own state for the page then being loaded, the address of the page Plaintiff had requested, the title of the document her browser was rendering, and the address of the page from which she had navigated. It wrote those three values into the parameters of a new request and directed Plaintiff's browser to send that request to Comscore's servers at sb.scorecardresearch.com. The request Plaintiff's browser sent was not a request for anything Plaintiff wanted; her browser classified it as a request for an image from a site other than the one she was visiting, and the substance of her communication traveled in the address of that image request.

38. Comscore prescribed those fields, and their meanings, before any transmission occurred. In the Comscore Tag Specification for web page impressions, document version 2.9.0, released December 1, 2023, Comscore identifies the parameters at issue as ones the tag's JavaScript gathers on its own, and defines c7 as the full page URL, c8 as the page title, and c9 as the referring URL. That same specification explains that the tag uses those parameters because they are necessary for Comscore to categorize the data appropriately, and that the c7 parameter is necessary for Comscore to attribute traffic correctly. Categorizing the data and attributing the traffic are operations Comscore performs on the values it receives. Defendant did not have to populate those

fields. The tag is built to take the contents of the communication, and it does so by default.

39. On the pages identified above, the page titles Comscore received in the c8 parameter were "Credit Management - Citi Credit Knowledge Center," "Credit Card Debt Relief | Citi.com," and "Understanding Credit Card Debt Forgiveness | Citi.com." Nothing about those transmissions is opaque, encoded, or in need of interpretation. A person reading the request learns what Plaintiff was reading.

40. The full page addresses Comscore received in the c7 parameter included the query string. On the Website's search results page, the value Comscore received was https://www.citi.com/credit-cards/knowledge-center/search-results?q=debt&pager=1, so the term Plaintiff typed into the Website's search box traveled to Comscore inside a named parameter of the same request. On the remaining pages, the addresses Comscore received each stated the subject matter of the page in ordinary words, including "debt-management," "credit-card-debt-relief-what-are-my-options," and "credit-card-debt-forgiveness." The addresses of the pages from which Plaintiff had navigated, received in the c9 parameter, were https://www.citi.com/credit-cards/knowledge-center and https://www.citi.com/credit-cards/debt-management.

41. In each of those same requests, Plaintiff's browser also transmitted to Comscore the persistent identifiers Comscore had previously set on her browser at the .scorecardresearch.com domain, in the UID and XID cookies. The substance of the communication and the identifier that attributes it to a particular person's browser therefore traveled together, in one transmission, on every page identified above. Those identifiers were not created during Plaintiff's visit. They were already present on her browser when she arrived, were transmitted outbound with the contents of each communication, and carried an expiration more than a year in the future. What Comscore received was not an anonymous page view. It was an addition to a file Comscore already maintained about this browser and the person using it.

42. Comscore states what that identifier is and what it is associated with. On its

Data Subject Rights page for tagging, available at comscore.com/About/Privacy/Data-Subject-Rights/Data-Subject-Rights-Tagging, Comscore explains that the cookie identifier is the means by which it identifies a person's browser, and that it associates that identifier with online activity information including browsing history, internet search activity and application usage, which it states may include visits to particular websites and to particular content. Comscore further explains on that page that it uses the information collected through its tags to operate and improve its business, including by producing reports, research and information products that it shares with its customers, and that it may also share tagging data for targeted advertising purposes.

43. Comscore states what it derives from that information. In the ScorecardResearch privacy policy, available at scorecardresearch.com/privacy.aspx, Comscore gives as examples of what it collects the content a person views on the websites she visits, the applications she uses, and the advertisements served to her through them, and states that its tags may collect data about a person's web browsing over time and across digital properties. That policy identifies, among the categories Comscore collects and derives, the inferences it draws about a person's predicted characteristics and preferences, and states that under United States state privacy laws Comscore treats its disclosures of that information as sales or as sharing for interest-based advertising.

44. Taken together, those facts describe a single sequence. The contents of Plaintiff's communications were captured at the moment she made them, by code that reads the page then being loaded. They were transmitted in the same request as the identifier by which Comscore identifies her browser, so they were attributed to her and not to nobody. On receipt they were categorized and the traffic was attributed, because Comscore states that is what those parameters are required for. Comscore's own tag design requires it to receive and process the full page address and the page title in order to categorize the page and attribute the traffic. Neither operation can be performed on a Full Page URL and a Page Title without reading them for what they say. Comscore

therefore read, and learned the contents and meaning of, Plaintiff's communications with the Website.

45. Figure 1 is a network capture showing an outbound request transmitted to Comscore at sb.scorecardresearch.com during the load of the Website's search results page for the term "debt." The request transmits the full page URL, including the search term, in the c7 parameter, the page title "Credit Management - Citi Credit Knowledge Center" in the c8 parameter, and Defendant's Comscore Publisher ID and site key in the c2 and c6 parameters.

**Figure 1**




46. Figure 2 is a network capture showing an outbound request transmitted to Comscore at sb.scorecardresearch.com during the load of the Website's page at /credit-cards/debt-management/credit-card-debt-relief-what-are-my-options. The request transmits the full page URL in the c7 parameter and the page title "Credit Card Debt Relief | Citi.com" in the c8 parameter.

/ / /

/ / /

**Figure 2**




47. Figure 3 is a network capture showing an outbound request transmitted to Comscore at sb.scorecardresearch.com during the load of the Website's page at /credit-cards/debt-management/credit-card-debt-forgiveness. The request transmits the full page URL in the c7 parameter and the page title "Understanding Credit Card Debt Forgiveness | Citi.com" in the c8 parameter, together with Comscore's UID and XID identifiers on the .scorecardresearch.com domain.

/ / /

/ / /

/ / /

**Figure 3**




## 2. The Google Tracker

48. Defendant embedded and deployed a Google tracking tag on the Website, operated by Google LLC. That tag reached Plaintiff's browser through a chain Defendant built. Defendant's own first-party script, served from www.citi.com, loaded a tag management system Defendant operates on the Website under its own account namespace, which in turn loaded Google's tag from googletagmanager.com. The request for Google's tag carried Defendant's own Google advertising account identifier, DC-6260004, in its address, so the tag arrived already configured to report to Defendant's advertising account. Each link in that chain exists because Defendant configured it, and none of it is necessary to render the Website's content.

49. Once loaded, the Google tag operated in the same manner as the Comscore tag. As part of the same page load, and without any further request or action by Plaintiff, the tag read from the browser's own state the address of the page Plaintiff had requested and the title of the document her browser was rendering, wrote those values into the parameters of a new request, and directed Plaintiff's browser to send that request to Google's servers at www.google.com/ccm/collect. The event type transmitted was

"page_view." What Google received was a report of the page view then in progress, identified by the address and title of the page then being delivered to Plaintiff.

50. On the pages identified above, the page titles Google received in the dt parameter were "Credit Management - Citi Credit Knowledge Center," "Credit Card Debt Relief | Citi.com," and "Understanding Credit Card Debt Forgiveness | Citi.com." The full page addresses Google received in the dl parameter each stated the subject matter of the page in ordinary words, including "knowledge-center," "search-results," "debt-management," "credit-card-debt-relief-what-are-my-options," and "credit-card-debt-forgiveness."

51. In each of those same requests, Plaintiff's browser transmitted to Google an identifier in the auid parameter, and that identifier was identical across every page Plaintiff visited. The substance of the communication and the identifier that attributes it to a particular person's browser therefore traveled together, in one transmission, on every page identified above.

52. Each of those requests also carried the parameter npa set to the value 0. In its published documentation on ads personalization settings in its publisher ad tags, available at support.google.com/admanager/answer/7678538, Google explains that ad requests to Google serve personalized advertising by default, and that the advertisement served is selected on the basis of both the content of the web page and the history of the individual user visiting that page. The same documentation explains that a publisher marks an ad request as non-personalized by setting npa to 1, that omission of the setting defaults to personalized advertising, and that a publisher may confirm whether a request was marked as non-personalized by locating the request in the browser's developer tools and looking for the parameter npa set to 1. None of the transmissions carrying the contents of Plaintiff's communications marked the request as non-personalized. Each instead carried the value that leaves personalized selection in effect.

53. Google states what it does with a record of what a person did on an advertiser's website. In its Google Ads Help documentation on data segments, available

at support.google.com/google-ads/answer/2453998, Google describes advertisers using that data to re-engage people who have previously interacted with their brand or services, describes a website-visitors segment used to show advertisements to past visitors as they browse sites and applications on Google's Display Network, and states that Google-engaged audiences are created automatically by adding to an advertiser's data segments a list of users who have engaged with the advertiser's website. Those users are added automatically, without human intervention.

54. Google states what determines the audiences it builds. In its Google Ads Help documentation on audience segments, available at support.google.com/google-ads/answer/2497941, Google states that audiences are determined by people's activity using Google products and third-party websites, or are estimated from the content that particular groups of people are likely to find interesting, and states that activity and content on third-party websites are used primarily to build the audience segments served on third-party websites. That same documentation describes affinity segments as a means of reaching users according to what they are passionate about and their habits and interests, and in-market segments as a means of reaching users according to their recent purchase intent. It further states that the data used to generate audience segments includes a person's page visit history and past Google searches, and that such data may be used to improve the bidding and the accuracy of an advertiser's audience campaigns.

55. Google states that the advertising decisions those audiences serve are made while a page is loading. In its Authorized Buyers real-time bidding developer documentation, available at developers.google.com/authorized-buyers/rtb/get-started/start, Google explains that a bid request supplies a bidder with context about an ad opportunity so that the bidder can determine the optimal creative and bid amount for the impression, that the bidder's application parses the request and applies its bidding logic to construct a response, and that responses arriving after the applicable deadline are excluded from the auction. The characterization of the opportunity and the decision that follows are completed within the interval in which a page is being loaded, or they

are not used at all.

56. Taken together, those facts describe the same single sequence. The contents of Plaintiff's communications were captured at the moment she made them, by a tag Defendant configured to report to its advertising account, in requests that were not marked as non-personalized. They were transmitted in the same request as the persistent advertising identifier by which Google recognizes her browser, so they were attributed to her and not to nobody. Google's published materials describe using activity and content on third-party websites to create and maintain audience segments, describe those segments in terms of what a person is passionate about and intends to buy, and describe the page visit history from which those segments are generated as data that may be used to improve bidding in advertising campaigns. The title, the full page address and the browser identifier that Plaintiff's browser transmitted to Google are the information from which Google can determine what page a person visited and associate that activity with a browser. Google's receipt and processing of those fields required it to read their contents and meaning. Google therefore read, and learned the contents and meaning of, Plaintiff's communications with the Website.

**3. Interception of Plaintiff's Communications While in Transit**

57. Two sets of code ran as part of the browser's single attempt to load and render each page Plaintiff requested: Defendant's own code, which delivered the page, and the Trackers' code, which Defendant embedded and configured. The second set of code did not deliver anything to Plaintiff. Its only function was to copy the contents of the communication Plaintiff was then making and to send that copy elsewhere.

58. The Trackers did not obtain the contents of Plaintiff's communications from Defendant's stored records after the fact. There was no separate transaction in which Defendant collected the contents of Plaintiff's communications, retained them, and later transferred them to anyone. The Trackers obtained the contents from Plaintiff's own browser, by operation of code Defendant placed on the page, in the course of the very page load by which Plaintiff communicated with the Website. The values each

Tracker received were read from the browser's state for the page then being loaded, and they identified that page and no other.

59. Because the contents were taken from the communication as the communication was being made, and were transmitted by the same browser in the course of the same page load, the transmissions to the Trackers were initiated by the Trackers' code and were concurrent with Plaintiff's communications with the Website. The Trackers accordingly acquired the contents of Plaintiff's communications while those communications were in transit, and while they were passing over a wire, line, or cable.

60. No action by Plaintiff was required to trigger any of these transmissions, and none of them was visible to her. She did not click anything, submit anything, or request anything from the Trackers. The Trackers execute automatically as a result of code Defendant placed and configured on the Website, and they execute as the page is being delivered. Plaintiff had no opportunity to see, review, prevent, or object to any of the transmissions before they occurred.

61. Defendant knew of and configured this arrangement. Defendant's own account identifiers accompany every transmission described above, including Defendant's Comscore Publisher ID and site key and Defendant's Google advertising account identifier, and Defendant's own first-party code and tag management system are what cause the Trackers' code to load and run. Those identifiers exist so that the transmissions are associated with Defendant's accounts with the Third Parties. The Trackers do not appear on the Website by accident, and they are not necessary to render the Website's content or functionality.

## VII. CLASS ALLEGATIONS

62. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers

between July 22, 2025 and the present.

63. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

64. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents and page titles of visitors' HTTP requests to the Trackers;
- Whether the URL contents and page titles of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Defendant's conduct violates the California Constitution;
- Whether Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

65. TYPICALITY: As a person who visited the Website and whose URL contents and page titles were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical

of Class Members.

66. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

67. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against All Defendants

68. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

69. Plaintiff brings this cause of action on behalf of herself and the Class.

70. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained. Section 631(a) further imposes liability on any person who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of those acts.

71. The page titles transmitted to the Trackers as named payload parameters, the full URLs of Plaintiff's and Class Members' HTTP requests to the Website, including the URL stating the term Plaintiff searched for on the Website, and the referring URLs identifying the pages from which they navigated, constitute the

"contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, Defendant caused each such communication to be duplicated by code Defendant embedded on the Website and transmitted to the Trackers at sb.scorecardresearch.com and www.google.com/ccm/collect, concurrent with Plaintiff's communications with the Website, and each Tracker received and read those contents while the same communication was in transit.

72. Defendant intentionally configured its Website to transmit Plaintiff's and Class Members' URL contents and page titles to the Trackers, configured that arrangement so that the transmissions were associated with its own accounts with the Third Parties, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class Members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

73. Section 631(a) reaches not only reading the contents of a communication but learning its contents or meaning. Each Tracker did both. Comscore states that the parameters carrying the page address and page title are required to ensure appropriate data categorization and that the page address is required for correct attribution of traffic, and it states that the identifier transmitted with them is how it identifies a browser and that the activity it associates with that identifier includes browsing history, internet search activity, and visits to specific websites and content. Google states that audiences are determined by people's activity using Google products and third-party websites, or are estimated from the content that particular groups of people are likely to find interesting, that Google-engaged audiences automatically add to an advertiser's data segments a list of users who have engaged with the advertiser's website, and that its audience segments are defined by what a person is passionate about and intends to buy. Neither operation can be performed without determining what the page said. Determining what a page is about, and placing the person who read it into a category

defined by that subject matter, is an effort to understand the substance of the communication, and it is the opposite of a mechanical sorting or routing of data.

74. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX. SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against All Defendants

75. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

76. Plaintiff brings this cause of action on behalf of herself and the Class.

77. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

78. The page titles, the full URLs, and the referring URLs of Plaintiff's and Class Members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8), because they communicate the substance, purport, and meaning of what Plaintiff and Class Members were reading and searching for. As described in the preceding tracker-specific allegations, Defendant caused those contents to be duplicated and transmitted to the Trackers at the endpoints identified above, and each Tracker acquired them while the same communication was in transit between the user's browser and servers operating under Defendant's control.

79. Defendant intentionally configured its Website to transmit Plaintiff's and Class Members' URL contents and page titles to each Tracker, configured that arrangement so that the transmissions were associated with its own accounts with the Third Parties, and permitted each Tracker to use that information for user profiling and

targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class Members did not consent to this interception, and no other exception applies.

80. To the extent any consent is asserted, the interceptions were undertaken for the purpose of committing a tortious act, namely the invasion of Plaintiff's and Class Members' privacy, and for the purpose of associating the contents of their communications with preexisting commercial profiles and preparing that data for commercial exploitation. Any asserted consent is therefore unavailing.

81. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X. THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against All Defendants

82. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

83. Plaintiff brings this cause of action on behalf of herself and the Class.

84. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

85. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class Members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

86. Defendant's conduct is also unfair. Defendant covertly transmitted

Plaintiff's and Class Members' URL contents and page titles to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class, including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof, is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class Members.

87. Plaintiff and Class Members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including the browsing URLs and page titles intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted content to build behavioral profiles and audience segments for which advertisers pay measurable prices.

88. Plaintiff and Class Members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising and measurement value generated by the Trackers' use of users' intercepted data, without compensating Plaintiff or Class Members. Plaintiff and Class Members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

89. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

/ / /

/ / /

## XI. FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against All Defendants

90. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Plaintiff brings this cause of action on behalf of herself and the Class.

92. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

93. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs and page titles reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity concerns a person's financial circumstances and is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

94. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a bank's website to search for and read information about credit card debt, debt relief, and debt forgiveness does not expect that the specific search terms she enters and the specific pages she reads will be covertly transmitted to separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

95. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring third-party tracking technologies on the

Website, Defendant caused the real-time, covert interception of the URL contents and page titles of Plaintiff's and Class Members' electronic communications and their transmission to third parties, where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the financial nature of the content browsed, by the fact that Defendant is a financial institution to which consumers turn for information about their debts, by the persistent and cross-site nature of the identifiers used, and by the commercial exploitation of the intercepted data.

96. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII. FIFTH CAUSE OF ACTION

**Intrusion Upon Seclusion**

**By Plaintiff and the Class Members Against All Defendants**

97. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. Plaintiff brings this cause of action on behalf of herself and the Class.

99. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

100. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding third-party tracking technologies that intercepted the URL contents and page titles of those communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents

of those communications.

101. The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the terms Plaintiff searched for and the specific content she was reading concerning credit card debt, debt relief, and debt forgiveness, and transmitted that content to third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the financial nature of the content browsed, the position of trust Defendant occupies as a financial institution, the commercial exploitation of the intercepted browsing activity, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

102. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against All Defendants

103. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

104. Plaintiff brings this cause of action on behalf of herself and the Class.

105. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

106. Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents and page titles of visitors' communications with

the Website, Defendant received monetary compensation, measurement and audience benefits, data licensing benefits, or other commercial value. Defendant's arrangement with these tracking operators enabled it to obtain analytics, audience measurement, retargeting, and advertising services that generated commercial revenue and business value.

107. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents and page titles of Plaintiff's communications and transmitting them to third-party Trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

108. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

109. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense. Plaintiff pleads this claim in the alternative. Plaintiff lacks an adequate remedy at law as to the relief sought here, because the statutory damages available under Cal. Penal Code § 637.2 and 18 U.S.C. § 2520 are fixed sums that do not reach and are not measured by the profits Defendant derived from the ongoing commercial exploitation of Class Members' intercepted browsing data, and because restitution and disgorgement of those profits are measured by Defendant's gain rather than by Plaintiff's loss.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class Counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., and Article I, Section 1 of the California Constitution;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the interception, or $100 per day per violation or $10,000, whichever is greater;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and
13. Such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: August 11, 2026

**LAW OFFICES OF ROSS CORNELL, APC**

By: *<u>/s/ Ross C. Cornell</u>*

Ross Cornell, Esq.
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*